Filed 8/1/23  St. Monica Development v. Gabrielino-Tongva Tribe CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| ST. MONICA DEVELOPMENT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GABRIELINO-TONGVA TRIBE et al.,<br><br>Defendants and Respondents. | B302377 c/w B308161<br><br>(Los Angeles County Super. Ct. No. SC091644) |
| THE CRANE GROUP, INC.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GABRIELINO-TONGVA TRIBE et al.,<br><br>Defendants and Respondents. | (Los Angeles County Super. Ct. No. SC092615)<br><br>**ORDER MODIFYING OPINION**<br><br>[NO CHANGE IN JUDGMENT] |

| GABRIELINO-TONGVA TRIBE, | (Los Angeles County Super. Ct. No. BC361307) |
|---|---|
| Plaintiff and Respondent, | |
| v. | |
| ST. MONICA DEVELOPMENT et al., | |
| Defendants and Appellants; | |
| ST. MONICA DEVELOPMENT, | |
| Cross-complainant and Appellant, | |
| v. | |
| GABRIELINO-TONGVA TRIBE et al., | |
| Cross-defendants and Respondents. | |

BY THE COURT:

It is ordered that the opinion filed herein on July 7, 2023, is modified as follows:

On page 73, subsection B, line 5 in the first full paragraph, delete "and the punitive damages eliminated" from the sentence.

There is no change in judgment.

_____

MOOR, J.                    RUBIN, P.J.                    KIM, J.

2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ST. MONICA DEVELOPMENT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GABRIELINO-TONGVA TRIBE et al.,<br><br>Defendants and Respondents. | B302377 c/w B308161<br><br>(Los Angeles County Super. Ct. No. SC091644) |
| THE CRANE GROUP, INC.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GABRIELINO-TONGVA TRIBE et al.,<br><br>Defendants and Respondents. | (Los Angeles County Super. Ct. No. SC092615) |

| | |
|---|---|
| GABRIELINO-TONGVA TRIBE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ST. MONICA DEVELOPMENT et al.,<br><br>    Defendants and Appellants;<br><br>ST. MONICA DEVELOPMENT,<br><br>    Cross-complainant and<br>Appellant,<br><br>    v.<br><br>GABRIELINO-TONGVA TRIBE et al.,<br><br>    Cross-defendants and<br>Respondents. | (Los Angeles County<br>Super. Ct.<br>No. BC361307) |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge.  Affirmed as modified.

Freeman Mathis & Gary, John K. Rubiner; California Appellate Law Group, Rex S. Heinke; Law Offices of Jonathan Stein and Jonathan Stein, in pro. per., for Defendant and Appellant Jonathan Stein and Defendant, Cross-complainant and Appellant St. Monica Development Company.

The Tym Firm, Ronald D. Tym; Law Offices of Jonathan Stein and Jonathan Stein, in pro. per., for Defendants and

Appellants Jonathan Stein and St. Monica Development Company, and The Crane Group, Inc.

Law Offices of Jonathan Stein and Jonathan Stein for Plaintiff and Appellant The Crane Group, Inc.

Chora Young & Manasserian, Paul P. Young, Joseph Chora and Armen Manasserian for Plaintiff, Cross-defendant and Respondent Gabrielino-Tongva Tribe.

_____

A three-phase trial was held on three consolidated cases arising out of contracts to develop casino gaming for the Gabrielino-Tongva Tribe (the Tribe). Appellants Jonathan Stein and St. Monica Development Company, LLC (SMDC), appeal from the judgment after trial in favor of the respondent Tribe and individual defendants: lobbyist Richard Polanco, attorney Elizabeth Aronson, and Tribal Council members Sam Dunlap, Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado, and Adam Loya.[1] On appeal, Stein and SMDC contend: (1) the trial court's statement of decision is not entitled to deference, because the court did not make any of the changes suggested by Stein and SMDC; (2) the trial court's findings are not supported by the evidence, including findings of an attorney-client relationship between Stein and the Tribe, a right to rescission of the contract between SMDC and the Tribe based on Stein's violation of the California Rules of Professional Conduct,[2] fraud, intentional interference with contract, tortious interference with

_____

[1] None of the individual defendants have filed a respondent's brief on appeal.

[2] All further references are to the California Rules of Professional Conduct, unless otherwise stated.

prospective economic advantage, conversion, breach of the covenant of good faith and fair dealing, attorney malpractice, and breach of fiduciary duty; (3) the compensatory damages awarded were too speculative and incorrectly calculated; (4) the punitive damages awarded were not supported by evidence of Stein's net worth; and (5) the trial court erred by finding Stein and SMDC dismissed their claims against the Tribe prior to trial, and by failing to adjudicate claims in their cross-complaint against the individual defendants.

We conclude the statement of decision is entitled to the usual consideration on appeal.  The trial court's finding that an implied attorney-client relationship existed between Stein and the Tribe, which allowed for rescission of the agreement based on Stein's violation of professional rules, is supported by substantial evidence, as are the court's findings of fraud and conversion.  Because we conclude the findings as to rescission, fraud, and conversion support the remedies provided in the judgment, we need not address whether these remedies were additionally supported by the remaining causes of action.  The compensatory damages awarded were not overly speculative, but the calculation was incorrect.  The amount must be reduced from $20,411,067.23 to $19,161,067.23, which was the maximum amount supported by the evidence.  The trial court concluded that Stein was estopped from objecting to punitive damages based on a lack of evidence of his net worth because he failed to provide credible evidence of his net worth in discovery, and no error has been shown.  The trial court's finding that Stein and SMDC dismissed their claims against the Tribe was supported by substantial evidence, and moreover, despite the dismissals, Stein and SMDC were

4

permitted to try their claims against the Tribe and the individual defendants in full.

Appellant The Crane Group appeals from the portion of the judgment ruling on Crane's action in favor of the respondent Tribe, and the individual defendants, Polanco, Aronson, Dunlap, Carmelo, Alcala, Perez, Machado, and Loya. On appeal, Crane contends: (1) it did not dismiss its claims against the Tribe; (2) the trial court's finding that Crane's right to payment was triggered by the threshold amount received by the Tribe, rather than the total amount paid by investors, was not supported by the language of the parties' agreement or the evidence; and (3) the trial court erred by finding Crane failed to provide evidence to support its claims for quantum meruit or account stated. We conclude that the trial court's finding that Crane dismissed its claims against the Tribe is supported by substantial evidence. We modify the judgment by reducing the amount of compensatory damages from $20,411,067.23 to $19,161,067.23, and as modified, we affirm.

In a separate appeal from a postjudgment order awarding attorney fees, which was consolidated for the purposes of appeal, Stein, SMDC, and Crane contend that: (1) the award of attorney fees must be reversed if the judgment is reversed on the merits; (2) the Tribe is judicially estopped from asserting that the appellants dismissed their claims against the Tribe, because the Tribe successfully argued it had not entered into a settlement; and (3) Stein is not liable for attorney fees assessed against SMDC by contract or as an alter ego of SMDC. We conclude that the reduction in the amount of compensatory damages did not alter the trial court's finding that the Tribe was the prevailing party. In addition, Stein, SMDC, and Crane failed to raise any

5

issue as to judicial estoppel or alter ego in connection with their appeal from the judgment, and these issues may not be addressed for the first time on appeal from the postjudgment order awarding attorney fees. Therefore, we affirm the postjudgment order awarding attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

### History and Initial Contact with Stein

The indigenous Tongva people of the Los Angeles Basin became known as "Gabrielinos" based on their association with the San Gabriel Mission. *(Gabrielino-Tongva Tribe v. St. Monica Development* (Nov. 8, 2013, B238603) [nonpub. opn.].) In 1994, the State of California recognized the Gabrielinos as "the aboriginal tribe of the Los Angeles Basin." (*Ibid*.) There are several associations of the descendants of the tribe in California. (*Ibid*.)

In early 2000, Stein approached Tongva descendent Sam Dunlap about obtaining federal recognition to facilitate a casino gaming operation in Los Angeles. Stein represented himself as a sophisticated transactional lawyer experienced in tribal gaming and financing. Stein and Dunlap courted a Gabrielino faction led by Jim Velasquez (the Coastal faction). The Coastal faction is the predecessor to the Tribe.

In May 2000, Stein's secretary mistakenly sent an invoice to Dunlap, and Stein sent a retraction letter explaining that he would keep a record of his time to establish the legal costs for the transaction, but no payment was due yet. Specifically, he stated, "Payment on Stein Structure Financings is often made in whole

6

or part from proceeds of the financing. Until that happens, I keep internal records of my time, to be fair and accurate in setting the legal costs for each separate financing transaction. If the transaction fails to go through, this time is often written off."

Stein formed SMDC, of which he is the sole member, to develop casino gaming with the Tribe. With the assistance of his personal counsel, Stein drafted an agreement between "the Gabrielino-Tongva Nation," which was also referred to in the agreement as "the Tongva" or "the Tribe," and SMDC (the SMDC agreement). SMDC agreed to assist the Tribe to achieve federal recognition and develop a casino in Los Angeles County. The SMDC agreement guaranteed compensation of $25,000 per month to SMDC, which would be deferred until funds were available, as well as 10 percent of the "net win" from certain casino earnings and a significant ownership interest in any future casino gaming by the Tribe. The SMDC agreement also contained an attorney fees provision. The SMDC agreement expressly provided that Stein was not the Tribe's attorney, and no attorney-client relationship was created between them.

Stein falsely represented to the Tribe that attorney Stephen Otto was acting as their lawyer. Stein prepared a tribal resolution appointing Otto as counsel for the Tribe, although Otto explicitly declined to accept the position orally and in writing. Otto sent a letter to the Tribe explaining that he had declined involvement, because Stein failed to share Otto's prior communications.

In March 2001, Stein presented the SMDC agreement to the Tribe without any other attorney present. Tribal Council members were not given time to read the document, take it home, or have a meaningful opportunity for a lawyer to review it. They

7

were told that they would be removed from the Tribal Council if they did not sign the agreement. The Tribe adopted the SMDC agreement through a resolution drafted by Stein and signed by several Tribal Council members on behalf of the "Gabrielino-Tongva Tribe," including Dunlap and Velasquez. The Tribal Council members signed the document under duress, without the benefit of counsel and without understanding the SMDC agreement.

The following month, a resolution concerning the SMDC agreement was signed by a substantially different group of Tribal Council members: Dunlap, Martin Alcala, Shirley Machado, Virginia Carmelo, and Edgar Perez. The Tribe approved amendments to the SMDC agreement through a series of resolutions on behalf of the "Gabrielino-Tongva Tribe" between April 2001 and May 2006.

Although the SMDC agreement disclaimed an attorney-client relationship, Stein provided an array of legal services to the Tribe and acted as the Tribe's general counsel. In addition to the resolution that adopted the SMDC agreement, Stein drafted several other resolutions for the Tribe. He hired attorneys to act as counsel of record for the Tribe, but directed their work. Stein hired, supervised, and fired all of the outside counsel for the Tribe.

The Gabrielino Tribal Gaming Authority was an entity formed within the Tribe to be responsible for the casino project. Stein held himself out as the Tribal Development Officer of the Tribe and the Chief Executive Officer of the Gaming Authority. All of the Tribe's books and records were kept at Stein's law offices, which is where SMDC was also located.

A few months after the SMDC agreement was signed, Stein hired attorney Rae Lamothe to serve as the Tribe's General Counsel. In 2002, Stein advised some of the Tribal Council members to file an action against a different group of Tongva descendants (the Morales Group) to gain access to membership information and historical documents that the Morales group had gathered. Stein filed the lawsuit on behalf of Dunlap, while Lamothe represented Alcala, Carmelo, and Perez. When it became clear that the plaintiffs would lose the lawsuit, Stein withdrew. The individuals lost and incurred expensive litigation costs. Although he had withdrawn as counsel of record, Stein insisted on conducting settlement negotiations personally. Dunlap filed for personal bankruptcy as a result of the judgment. In an email to Lamothe, Stein explained that Dunlap's bankruptcy counsel would serve as attorney of record for the bankruptcy, but Stein would supervise Lamothe in representing the Tribe's interest in Dunlap's bankruptcy.

Stein provided the Tribal Council with a lengthy legal memorandum arguing that the Tribe was a state-recognized tribe, and state-recognized tribes did not need federal recognition to conduct legal gaming operations on a state Indian reservation in California, only state approval of the gaming. Stein circulated versions of the memorandum to political leaders. Under Stein's theory, the SMDC agreement would avoid review by the National Indian Gaming Commission (NIGC), which invalidates agreements that provide a significant ownership interest to non-Native Americans in tribal gaming by federally recognized tribes.

Stein hired former state legislator Richard Polanco as a political advisor and lobbyist for the Tribe. Stein also hired The Crane Group to lobby for the Tribe in Washington, D.C. In

March 2005, Crane entered into a written consulting agreement with the "Gabrielino-Tongva Tribal Nation," in which Crane agreed to lobby for the Tribe to obtain federal recognition (the Crane agreement). The Tribe agreed to pay $12,500 per month to Crane, but the amount would accrue until the Tribe received payment of at least $2 million in investment funding. Once an investor had been secured and $2 million paid, the Tribe would be required to pay Crane all of the monthly fees that had accrued. The Crane agreement also contained an attorney fees provision. A resolution approving the Crane agreement was executed on March 26, 2005, by Dunlap, Alcala, Machado, Carmelo, and Perez.

In October 2005, the Tribe held its first election for the Tribal Council, electing Dunlap, Alcala, Machado, Carmelo, Perez, and Adam Loya (the Tribal Council). Stein published a law review article in the University of San Francisco Law Review about the gaming rights of Indian tribes that had state recognition but not federal recognition.

In April 2006, former California Supreme Court Justice Cruz Reynoso wrote a letter to the California Legislative Counsel stating that he had been retained by the Tribe to perform a legal analysis of the Tribe's gaming rights. The California Constitution stated that the Governor could negotiate compacts for certain gaming activities by "federally recognized Indian tribes on Indian lands in California in accordance with federal law," and in the next sentence concluded, accordingly, those gaming activities were permitted on "tribal lands subject to those compacts." In Reynoso's opinion, the provision was ambiguous because it referred to Indian lands in the first sentence and tribal lands in the second sentence. Reynoso argued the ambiguity

10

should be interpreted to allow gaming activities by all California Indian tribes, including tribes that were state recognized but not federally recognized.

Former California Supreme Court Justice Armand Arabian also provided a letter to the California Legislative Counsel opining that the California Constitution contained an ambiguity because of the use of "Indian lands" and "tribal lands." He opined that proposed draft legislation was within the power of the Legislature to enact.

In the spring of 2006, attorney Lamothe stopped working with the Tribe and attorney Liz Aronson became the Tribe's Assistant General Counsel.

## The Libra Investment

On May 20, 2006, Libra Securities, LLC, a Los Angeles investment fund managing several institutional investors, entered into an agreement with "the Gabrielino-Tongva Tribe, a tribal sovereign for the Gabrielino aboriginal tribe of Los Angeles Basin, formerly known as the San Gabriel Bank of Mission Indians and now recognized by Legislative Resolution Chapter 146 of the California Code" (the Libra agreement). Stein hired an experienced tax and corporate lawyer to assist the Tribe with the financing transaction, directed her work, and fired her days before the Libra agreement was scheduled to close. Stein handled the closing on behalf of the Tribe.

The Libra agreement stated that the Tribe wanted to establish Las Vegas-style casinos in Los Angeles County to conduct gambling activities. Libra agreed to invest funds in exchange for an interest in the revenue. Libra agreed to make a

11

one-time payment to the Tribe of $900,000 and an initial investment of $1,250,000.  In addition, Libra committed for a one-year period, subject to extension, to invest an additional $19,000,000, subject to satisfaction or waiver of certain conditions.  For an additional payment of $900,000, Libra could extend the time period of the commitment for an additional year.

There were four conditions precedent to further funding.  The first condition was that "[Senate Bill No.] 175 or substantially similar legislation[ ] has been passed into law (i.e., by virtue of being signed into law by the Governor of the State of California or otherwise)."  The exhibits attached to the agreement included a document appearing to be Senate Bill No. 175 (Senate Bill 175), introduced by Senator Edward Vincent, as amended in the Assembly and the Senate.  Among other provisions, the document proposed to create a state Indian reservation at Hollywood Park in Inglewood for the Gabrielino-Tongva Tribe, and interpreted existing language in the California Constitution to allow gaming on tribal lands, such as the Gabrielino-Tongva reservation at Hollywood Park.

The remaining conditions were that (1) no material change had occurred, (2) the Tribe was, and continued to be, recognized by the State of California as an Indian tribe, and (3) if required by Senate Bill 175 or any other legal requirement, the Libra agreement was approved by the Bureau of Indian Affairs under the Department of the Interior of the United States.  The Tribe and the Gaming Authority must deliver a certificate attesting that each of the conditions precedent to funding had been satisfied in all material respects.

The Tribe represented that the only known groups of persons claiming to be the legitimate governing body of the

12

Gabrielinos were: (1) the San Gabriel faction led by Anthony Morales, (2) a Beaumont group led by the Blount family, (3) a West Los Angeles group led by Robert Dorame, and (4) the Coastal faction led by Velasquez.

The Tribal Council members believed the document attached to the Libra agreement as exhibit B was an actual bill drafted by a member of the State Senate or his staff. The Tribal Council members were not aware that the document was a crude draft prepared by Stein that was never introduced in the Legislature.

In May 2006, the Tribe adopted a resolution to amend the SMDC agreement that was signed by the Tribal Council. On May 22, 2006, the Tribe received its portion of the first tranche of investment funding from Libra. Certain expenses provided for in the Libra agreement were deducted prior to funding, so the total amount received by the Tribe was $1,805,889, which the Tribe was required to spend in accordance with an approved budget.

## Legislative Counsel Opinion

The same day that the Tribe received funds, the California Legislative Counsel issued an opinion to Senator Vincent that the Tribe was not a state recognized tribe, and even if it were, a state recognized tribe could not engage in gaming without federal recognition. The opinion stated in a footnote, "the state of California may recognize a tribe that is not federally recognized, but it has not done so." The opinion expressly concluded, "the Legislature has no power to authorize a non-federally recognized Indian tribe to operate slot machines, lottery games, and banking

and percentage card games in California, even if the state gives the tribe the designation of a state-recognized tribe."

Stein learned about the Legislative Counsel's opinion the following day. Although he believed it was material to the Libra agreement, he did not transmit the opinion to Libra for several months.

## Disputes Begin in Summer 2006

On July 15, 2006, Stein wrote an email to Aronson and the elected Tribal Council members about Dunlap's request for reimbursement of $18,000. Stein argued that the approved budget for the first tranche of investor funds did not allow payment to Dunlap, so a payment to Dunlap could cause the investors to look unfavorably on the investment. He added, "We recently suffered a huge defeat in Sacramento. On August 9, our next report to investors is due. It may include facts that will sour them on this investment, as we previously assured them that [Senate Bill No.] 175 was authored by Senator Vincent and would be introduced publicly, a major step towards the casino. In the August 9 report, we are likely going to state that Sen. Vincent refused to author [Senate Bill No.] 175 and that it will not be publicly introduced this legislative session."

Disputes arose between the Tribal Counsel, Stein, and Aronson throughout the summer of 2006. Aronson accused Stein of billing and double-billing legal costs from his law practice to the Tribe's Libra funds and unreasonably delaying finalization of a settlement with the Morales group. Stein asked Aronson to resign, and on behalf of the Tribe, drafted a termination letter and resolution terminating her.

At a meeting on September 9, 2006, at Stein's office, Stein demanded that the Tribal Council fire Aronson, and when they refused, he said that he quit. The Tribal Council carried the documents that they could out of Stein's law office, but many documents were left behind, including individual tribal member records and financial records. Stein delivered a letter to the Tribal Council resigning his positions in the tribal administration. Stein later told the Tribal Council that he had frozen the Tribe's funds for two weeks and would return the funds to the Libra investors.

The Tribe met with Libra. Libra assured the Tribe that their actions were acceptable as long as they abided by the contract.

Stein wanted the Tribal Council to replace Aronson with attorney Jim McShane with the law firm of Sheppard Mullen Richter and Hampton, LLP. On September 19, 2006, Stein introduced McShane to the Tribal Council. The Tribe ultimately hired McShane without referring to Stein in their retainer agreement.

On September 26, 2006, Stein wrote an email to the Tribal Council setting a deadline the following day for several matters. He advocated to be the sole signatory on certain financial accounts, but cautioned against having an individual Tribal Council member as a sole signatory without insurance. After explaining several actions to be taken, Stein stated, "If we miss the deadline, then I will be forced to send a letter to Libra which I will draft today, explaining the damage and other factors which your meeting with [Libra] may have glossed over. I earnestly wish to avoid any letters as our dirty laundry should stay at home. I also do not wish to endanger the $2.5 million funding

that hangs in the balance." He signed the email as Chief Executive Officer of the Gabrielino Tribal Gaming Authority.

On September 27, 2006, Stein wrote an email stating that representatives for Libra had drafted and revised a memorandum requesting $2.5 million for the Tribe. Stein was waiting for the final copies from Libra.

On September 29, 2006, Stein wrote an email to the Tribal Council and Libra stating that the effort to establish the Gabrielino Casino and Resort was officially dead in the water. He had not been paid $120,000 that was past due, and there had been no commitment for payment of future contributions. Instead, the Tribal Council had paid itself, and records showed $20,000 might be missing from the account. More than $100,000 in additional funds were in the sole and exclusive control of a non-tribal third party with no business relationship to the Tribe or the Tribal Gaming Authority. Of the political checks that had been written, two checks were correct, three checks were in the wrong amounts, two checks might be duplicates, all of the payments were late, and Stein had not been paid.

Later that day, the Tribal Council wrote a letter to Stein directing him to "immediately suspend all of [his] activities and those of [SMDC] on behalf of the Tribe and the Tribal Gaming Authority."

The next day, Stein sent an email to the Tribal Council acknowledging receipt of the Tribe's termination letter. He suggested working together until December 15, at which time he would step aside. He wanted the Tribe to commit to pay $500,000 in political contributions, as well as payments to himself for several items. He added, "Also, per my contract, if I leave Dec 15 (by your choice or mine, with or without cause), here

16

is what happens:  [¶]  $2 million is immediately due SMDC from the Tribe and, hopefully, Libra could finance that.  [¶]  My 10 [percent] slot revenue interest remains intact.  I need an estoppel certificate to assure that.  [¶]  The only difference is, instead of working 7 days a week and waiting for my money, I don't work and I get far more money immediately.  You pay me and the new CEO, instead of just me.  [¶]  I will probably spend 2007 on sabbatical in Rome and Europe, unless I were paid to stay and consult with your new team.  Thus there would be no need to worry about me 'bad mouthing' the Tribe in Sacramento after I left on good terms."

At a Tribal Council meeting on October 3, 2006, McShane, as outside counsel for the Tribe, told Stein that the Tribe had accepted his letter of resignation, and to the extent that Stein claimed not to have resigned, the Tribe was terminating him.

## Demand Letters and Contact with Tribe Members

On October 5, 2006, attorney Geoffrey Long, on behalf of Stein and SMDC, wrote a letter to the Tribal Council and McShane, demanding payment of $2,464,535.96, plus additional amounts.

The Tribe's membership records were highly confidential documents, which individually belonged to the members, but collectively belonged to the Tribe.  Stein retained possession of: the confidential individual tribal membership records, membership lists, and contact information for the members; tribal letterhead, website, cell phones, and computers; and all the government filings that Stein had caused to be filed on the Tribe's behalf.

17

In October 2006, Stein used the Tribe's confidential membership list without the Tribal Council's consent to contact the membership directly.  He sent a letter to each member of the Tribe on Tribal Council letterhead that listed Alcala, Carmelo, Dunlap, Loya, Machado, and Perez as the Tribal Council members.  Stein stated that the Tribal Administration Office was designed to act as a "check and balance" on the Tribal Council and supervise the use of investor funds.  Stein had raised $21 million for the Tribe in May 2006, but the Tribal Council refused to authorize a letter announcing the funding agreement to the membership.  He added, "This letter is sent without their authorization."  Stein stated that for the past five years, he paid the expenses of the Tribe and made all of the decisions on the casino project, subject to final approval by the Tribal Council.

He stated, "My assistant, Barbara Garcia, is the Tribal Administrator.  Barbara answers the Tribal Administration Office phone and keeps membership records.  With the excellent work of the Tribal Council, we built up tribal membership to over 1900 Gabrielinos.  Your membership records are secure, private and computerized.  Each of you has your own manila folder for BIA and personal documents."

Stein claimed to have been fired because of his repeated requests to verify the amounts held in the Tribe's checking account and to complete a routine financial audit.  The signatories on the Tribe's accounts were changed without his knowledge.  Check books and bank records had been removed from the Tribal Administration Office.

Stein touted his organizational achievements, including nonpartisan Tribal Council elections in the fall of 2005.  He stated, "I worked this summer with Assemblyman Tom Umberg

18

(D-Garden Grove), who introduced [Assembly Bill No.] 1561. [Assembly Bill No.] 1561 would establish a California State Indian Reservation at Hollywood Park, allow the Tribe to conduct gaming there <u>without</u> federal recognition, and establish a casino with 7500 slot machines (subject to negotiation of a tribal compact).  [¶]  The first page of the bill summary for [Assembly Bill No.] 1561 is enclosed."

In conclusion, Stein pleaded, "Despite my hard and diligent work, I have been fired by the Tribal Council, for arguing for a 'check and balance' on their authority.  [¶]  I organized elections in October 2005, raised $21 million in May 2006, introduced gaming legislation in August 2006, conducted the first independent financial audit in September 2006, and was fired on October 3, 2006.  Is that good for the Tribe?  [¶]  I ask your help. If you support an independent Tribal Administration Office that can operate as a 'check and balance' on the Tribal Council, please sign and return the letter enclosed.  [¶]  If you support the Tribal Administration Office's work on the casino project, which I designed, funded, hired all the professionals, and now supervise, then please sign and return the letter.  [¶]  Although your response to this letter does not bind the Tribal Council, it will let them know what the Tribal Members think and want.  Thank you and feel free to call Barbara with any questions."

Stein terminated the Tribal Council members' cell phone, email, and website access.  When individual Tribal Council members requested the return of records to the Tribe, Stein's office refused.

On October 23, 2006, attorney Long sent another demand letter enclosing a complaint that SMDC intended to file if the

Tribe refused to engage in settlement negotiations. Long sent a final demand letter on November 2, 2006.

Libra provided a letter of support for the Tribe stating that nothing was wrong with the actions taken with respect to the contract, and the Tribal Council distributed copies to its membership.

## Litigation Filed and Stein's Attempt to Usurp Control of the Tribe

### A. The Tribe's Complaint

On November 2, 2006, the Tribe filed the instant action against Stein, the Law Offices of Jonathan Stein, and SMDC (case number BC361307). The Tribe's operative fourth amended complaint alleged causes of action for: (1) conversion; (2) breach of fiduciary duty; (3) misappropriation of trade secrets; (4) breach of confidence; (5) intentional interference with economic relationships; (6) negligent interference with economic relationships; (7) breach of contract (SMDC only); (8) breach of the implied covenant of good faith and fair dealing (SMDC only); (9) legal malpractice (Stein and Law Offices only); (10) declaratory relief; (11) violation of Penal Code section 502, subdivision (c); (12) unfair competition; (13) rescission per California Rules of Professional Conduct, Rule 3-300 (Stein and Law Offices); (14) alter ego liability; and (15) fraud.

### B. SMDC Complaint

That same day, on November 2, 2006, SMDC filed a complaint against "Gabrielino-Tongva Tribe," Gabrielino Tribal Gaming Authority, Libra, attorney Aronson, lobbyist Polanco, the law firm Sheppard Mullen, and each of the Tribal Council members (case No. SC091644). In May 2007, SMDC filed an amended complaint against "Gabrielino/Tongva Nation, also known as Gabrielino-Tongva Tribe, also known as Gabrielino Tribal Gaming Authority," Libra, Aronson, Sheppard Mullen, Polanco, and each of the Tribal Council members.

Dunlap later filed a cross-complaint in SMDC's action against Stein, the Law Offices, SMDC, and individual defendants.

### C. Effort to Take Control of the Tribe

Stein sent a letter to the membership of the Tribe anticipating a meeting on November 18, 2006, to introduce a newly formed "Financial Oversight Committee" and his intent to call for a recall election of the Tribal Council. No recall election was held.

On December 17, 2006, at Stein's direction, a member of the Tribe named Linda Candelaria filed a statement of unincorporated association under the name "Gabrielino-Tongva Tribe." The agent for service of process was Stein's legal assistant, and the entity's business address was Stein's law office.

### D.  Crane Complaint

In January 2007, Crane terminated its agreement with the Tribe.  On January 31, 2007, Stein filed a complaint on behalf of The Crane Group against "Gabrielino-Tongva Tribe," Gabrielino Tribal Gaming Authority, Aronson, Polanco, and each of the Tribal Council members (case No. SC092615).  The Crane Group complaint alleged causes of action for breach of contract, intentional and negligent interference with contractual relations, fraudulent conveyance, negligence, account stated, quantum meruit, and declaratory relief.  The actions brought by the Tribe, SMDC, and Crane were eventually found to be related and consolidated.

### E.  Actions on Behalf of the Tribe

In February 2007, the Tribal Council members held a convention to ratify the constitution of the "Gabrielino/Tongva Nation."  Meanwhile, a group that included Candelaria (the Candelaria Group) held elections in the spring of 2007 on behalf of the "Gabrielino-Tongva Tribe."

In March 2007, Stein and the Candelaria Group entered into an agreement under which the Candelaria Group agreed that the Tribe was estopped from denying an obligation to pay $2,700,897.65 under the SMDC agreement.

### F.  Stein and SMDC Cross-complaint

On August 20, 2007, Stein and SMDC filed a cross-complaint in the Tribe's action against "Gabrielino/Tongva

Nation, also known as Gabrielino-Tongva Tribe, also known as Gabrielino Tribal Gaming Authority," Aronson, Polanco, and each of the individual Tribal Council members. The cross-complaint alleged several causes of action, including breach of contract, fraudulent conveyance, indemnity, apportionment, contribution, and declaratory relief. No proof of service of the summons and cross-complaint were filed as to any cross-defendant.

On September 26, 2007, Stein and SMDC filed another cross-complaint in the Tribe's action against "Gabrielino/Tongva Nation, formerly known as Gabrielino-Tongva Tribe, formerly known as Gabrielino Tribal Gaming Authority," Aronson, Polanco, and each of the individual Tribal Council members. The cross-complaint alleged causes of action for indemnity, apportionment, contribution, and declaratory relief only. Proof of service was attached.

In 2008, Stein published a law review article in the Santa Clara Law Review, providing a survey of state-recognized tribes and state recognition processes across the United State.

**Settlements, Doe Defendants, and Dismissals**

### A. Purported Settlement of the Tribe's Claims

On September 28, 2007, SMDC filed an amendment to its complaint naming "Gabrielino/Tongva Nation" in place of Doe defendant 1.

On October 30, 2007, Stein and SMDC entered into a settlement in which the Candelaria Group agreed to settle the Tribe's claims against Stein and SMDC for $1,000. Candelaria signed the agreement on behalf of the "Gabrielino-Tongva Tribe,"

23

and represented that her group had the authority to settle the Tribe's claims.

Stein and SMDC filed a motion for entry of judgment pursuant to the settlement agreement, as provided under Code of Civil Procedure section 664.6. On April 1, 2008, the trial court granted the motion to enforce the settlement agreement as to the settling entity. The court noted there was little evidence in the record before the court of continuity between the various unincorporated associations purporting to conduct affairs for the Tribe. One entity expressly assumed liability to SMDC under the SMDC agreement as a successor in interest to the contracting party and settled claims against the predecessors in interest, while the other entity alleged it was the contracting party, but refused to admit liability to SMDC. The trial court dismissed all actions by or against the settling entity as to Stein, and SMDC.

The court noted the question was whether the non-settling entity was the real party in interest as to the Tribe's complaint and SMDC's complaint. If not, the Tribe's complaint should be dismissed based on the settlement. However, by alleging that it was the contracting party, the non-settling entity contended it was the real party in interest as to all of the consolidated actions. SMDC was not entitled to dismissal of any claims that the non-settling entity might have in the consolidated actions. Because the non-settling entity alleged that it succeeded to the benefits and burdens of the SMDC agreement, none of the parties named as "tribes" in any consolidated action may be dismissed.

24

### B. Dismissals from SMDC's Complaint

On April 30, 2008, SMDC filed a dismissal of all causes of action against the Tribe that had been stated in SMDC's complaint. After filing additional dismissals, the remaining causes of action in SMDC's complaint were claims against "Gabrielino/Tongva Nation," as substituted for Doe defendant 1, and claims against the individual defendants for intentional and negligent interference with contract, and fraudulent conveyance.

### C. Dismissals from Stein and SMDC's Cross-complaint

Also on April 30, 2008, SMDC dismissed all causes of action against "Gabrielino-Tongva Tribe" stated in the September 26, 2007 cross-complaint.[3] The causes of action alleged in the September 26, 2007 cross-complaint against the individual defendants continued to be total indemnity, equitable indemnity and apportionment, contribution, and declaratory relief.

### D. Settlement and Dismissals from Crane Complaint

On April 24, 2008, Crane filed an amendment to its complaint substituting "Gabrielino/Tongva Nation" in place of Doe defendant 8. A few days later, on April 30, 2008, Crane filed

---

[3] The request for dismissal incorrectly referred to the filing date of the cross-complaint at issue as September 27, 2007.

a dismissal of all causes of action against "Gabrielino-Tongva Tribe" in its complaint.

Years later, on September 25, 2011, Crane entered into a settlement agreement under which the Candelaria Group acknowledged the Tribe's debt to Crane in the amount of $386,492. On October 19, 2011, Crane filed another dismissal of all causes of action in its complaint against "Gabrielino-Tongva Tribe," as well as those against Gabrielino Tribal Gaming Authority.

As a result of additional dismissals, the causes of action remaining in Crane's complaint were claims against "Gabrielino/Tongva Nation," as substituted for Doe defendant 8, and claims against the individual defendants for intentional and negligent interference with contract, and fraudulent conveyance.

## Summary Judgments and Appeals

On September 26, 2008, the trial court granted Polanco's motion for summary judgment as to SMDC's complaint, Crane's complaint, and SMDC and Stein's cross-complaint. *(St. Monica Development Co. v. Polanco* (July 19, 2010, B211466) [nonpub. opn.].) Another panel of this appellate court ultimately reversed the summary judgment ruling, finding that triable issues of fact existed concerning the identities of the tribal associations.

On October 14, 2008, SMDC obtained an entry of default in its action against "Gabrielino/Tongva Nation, a California unincorporated association, a successor in interest to Gabrielino-Tongva Tribe, aka Doe No. 1" and Crane obtained an entry of default in its action against "Gabrielino/Tongva Nation, a California Unincorporated Association, aka Doe #8."

26

Stein and SMDC filed motions for summary judgment of the Tribe's complaint, arguing that they had settled all claims with the "Gabrielino-Tongva Tribe," judgment had been entered by the trial court, and the claims pursued by the Tribe should be dismissed. They claimed the entity remaining in litigation was a breakaway group called "GT Nation," which came into existence after Stein was terminated as an officer of the Tribe.

The Tribal Council denied that it was a breakaway group, attesting that it was the tribal entity which had contracted with SMDC, hired and fired Stein, filed the instant lawsuit, and had sole authority to prosecute or settle the Tribe's lawsuit. The trial court granted the summary judgment motions. The court concluded that the Tribe failed to submit evidence raising a triable issue of fact as to why the settlement agreement, which plainly called for dismissal of the Tribe's action against SMDC and Stein, was not determinative. The Tribe appealed the judgments.

On appeal in that matter, Stein and SMDC contended they were entitled to judgment as a matter of law, because the tribal entity that sued them entered into a written agreement settling all of its claims against them. In an unpublished opinion, another panel of this appellate court concluded that the evidence was rife with disputed issues of material fact, including whether the Candelaria Group had authority to settle the plaintiff's claims in the instant case against Stein and SMDC. Stein and SMDC had not met their burden on summary judgment, and the judgments were reversed. (*Gabrielino-Tongva Tribe v. St. Monica Development* (Nov. 8, 2013, B238603) [nonpub. opn.].)

27

## Claims Pending for Trial

The action was reassigned to Judge Yvette M. Palazuelos. The Tribe sought an order that the only claims pending for trial were those in the Tribe's complaint against Stein, the Law Offices, and SMDC. After a hearing on July 29, 2014, Judge Palazuelos issued an order concerning the claims for trial.

Stein and SMDC argued the Tribal Council members had authority to act for "Gabrielino/Tongva Nation," which SMDC substituted in its complaint in place of a Doe defendant. Defaults had been entered against "Gabrielino/Tongva Nation" with respect to SMDC's complaint and Crane's complaint, and Stein and SMDC argued that "Gabrielino/Tongva Nation" was not the real party in interest for purposes of the Tribe's complaint.

The Tribe responded that its identity was "Gabrielino-Tongva Tribe," the name under which it had commenced the litigation. The Tribal Council refused to relinquish its tribal name to the Candelaria Group, and a dispute existed between the parties as to whether the party's name had changed during the course of the action. Default was improper, because the Tribe filed an answer to SMDC's complaint under the party name that it had used throughout. Stein and SMDC could not obtain defaults against the Tribe for refusing to give up its name and refusing to assume the name that Stein and SMDC wanted it to use. Through a fictitious name designation, Stein and SMDC implied that the Tribe was a new party to the action, when the Tribe had been an active participant since the inception of the litigation. Doe amendments were appropriate when a claimant was truly ignorant of the defendant's true name. There was no evidence that "GT Nation" was the Tribe's name. Stein and

SMDC could not obtain a default against the Tribe by referring to it as "GT Nation," when the Tribe had commenced litigation as "Gabrielino-Tongva Tribe" and filed an answer in at least one case.

The court concluded the defaults were inoperative against the Tribe, and the claims in the Tribe's complaint could proceed to trial. Stein argued that the real party in interest and the Tribal Council's authority to act for the Tribe were disputed issues to be established at trial. In addition, if the Tribe was the real party in interest, Stein argued, the Tribe was liable for the claims against it. The dismissals never applied to the Tribe; they applied to the Candelaria Group.

The court concluded, due to the triable issues of fact concerning the identity of the real party in interest and the settlement agreement, the defendants' claims could proceed to trial as well. The court noted that after trial, the court might conclude the claims in the SMDC complaint and the operative cross-complaint did not survive, but for purposes of going forward, the court allowed the claims in the SMDC complaint and the operative cross-complaint to proceed to trial. The court similarly allowed Crane's claims to move forward.

**Trial**

A trial began in June 2016, and was conducted in three phases. In the first phase, on July 5, 2016, the jury found the Tribe, also referred to during trial as the Dunlap Faction, had standing and the capacity to sue in the instant action.

Stein requested a bench trial for the remainder of the case. The second phase of the trial was frequently suspended over the

next two years, primarily due to Stein's health issues.  Crane participated in the trial.

The Tribe's gaming expert, Phil Hoag, testified that if the Tribe were federally recognized, the SMDC agreement would be invalidated and unenforceable under federal regulations due to the ownership interest of a non-tribe member.

The Tribe's ethics expert, Arthur Margolis, opined that there was an attorney-client relationship between Stein and the Tribe, despite statements in the SMDC agreement that no attorney-client relationship was created.  He explained Stein's numerous violations of the Rules of Professional Conduct and breaches of his fiduciary duties to the Tribe.

Stein testified as to the following.  Although the state recognized the Gabrielinos as a tribe, it never took the next step to recognize a single governing body.  Libra was an investment bank that organized multiple investment funds.  Stein negotiated the substance of the agreement with Libra's representatives Sammy Lai and Jess Ravich.  Libra was required to provide $2.15 million under the agreement, and could fund, within its discretion, up to $21 million.  Libra was not required to provide any particular amount after $2.15 million.  There was an agreed budget for the first $2.15 million, and the Libra agreement expressly prohibited use of the investor funds for any purpose other than the agreed budget.  To obtain another $2 million, the Tribe had to submit a new budget, and Libra had absolute discretion over whether to fund the new budget.

Senator Vincent agreed to introduce legislation with the language that Stein put in his draft legislation, which was attached to the Libra agreement as exhibit B.  Stein told the Tribal Council that Senator Vincent would "gut-and-amend"

Senate Bill No. 175 in the form shown in exhibit B. The document was sent to the Legislative Counsel, but never became a prebill. The Legislative Counsel's May 22, 2006 opinion was a preliminary opinion in response to the document Stein drafted as Senate Bill No. 175. Generally, the Legislative Counsel releases a preliminary opinion, and after negotiations, issues a final opinion. Stein admitted that the Legislative Counsel opinion made it less likely that Stein's draft would become legislation, because Stein had to negotiate with the Legislative Counsel and get Senator Vincent to "put the bill over the desk to become public." In Stein's view, however, the Legislative Counsel opinion was a little bump in the road and not a big deal. Senator Vincent told Stein that he was facing substantial pressure not to put the legislation forward publicly from tribes that had casino operations and he would be committing political suicide to do so.

In Stein's September 27, 2006 email to Libra and others, he was concerned about whether political contributions that had been promised would be made by a deadline on September 30, 2006. Stein stated, "In addition, I was hoping that we would actually move forward and begin the next phase with the investors because that's a phase process. To get money in January, you've got to start early, and this was already the end of September." When asked if there was a realistic possibility as of September 27, 2006, that the Tribe was getting the next tranche from the Libra investors, Stein answered that there was not. Stein had been hoping there was, but it was not a realistic hope because of the Tribe's subsequent actions. When asked what evidence he had that Libra would not have paid the next tranche, Stein said a Libra representative told him that Libra would wait until the dispute was resolved.

Attorney McShane testified as well. Stein told McShane that future tranches of money may become available, but if the investors perceived problems, they did not have an obligation to advance further funds.

Stein's attorney Kenneth Sulzer testified. SMDC named Libra as a defendant in its complaint because Libra had provided funds to the Tribe and said they would consider more. If Libra gave more funding to the Tribe, SMDC wanted to make sure to be paid out of the additional funding. Because of the dispute between SMDC and the Tribe, it was clear that SMDC would not be paid from any funds that the Tribe received from Libra, so the complaint was a mechanism to resolve the dispute between SMDC and the Tribe without those funds disappearing. SMDC's desire was to work everything out and keep the money flowing, but not get cut out of the deal.

Tribal Council member Carmelo testified that in 2001, five groups of Gabrielino tribe members were operating separately. The Libra agreement provided a smaller initial investment to help the Tribe in their effort to seek federal recognition. The Tribe believed it had state recognition, and that from state recognition, the Tribe would be able to have gaming in California. Once funds came in and the Tribe was discussing a new budget for the following year, people were fighting over where to spend the money and the budget for funds that were going to come in.

Tribal Council member Loya testified. Under the Libra agreement, the first tranche of funds was to "secure our process." Another tranche was going to come in soon after, as long as everything checked out, including the Tribe's accounts and balances, and the Tribe submitted budgets that Libra approved.

He believed the Libra agreement was intended to fund the casino, not the federal recognition process.

Daniel Crane, the lobbyist who owns Crane, testified about Crane's right to payment under the Crane agreement and the evidence to support quantum meruit. In June 2006, Crane accepted $50,000 from the Tribe as the first installment of the amount owed under the Crane agreement, and Stein assured him that additional payments would be made. There was a reasonable expectation at that time that additional investment money would be forthcoming. Crane believed the value of the services that his company rendered was $262,000, plus interest. The trial court asked several questions about the work conducted by Crane after receiving payment from the Tribe. Crane stated that his firm does not track the time spent on work for any client; he could not estimate how much time Crane spent working on matters for the Tribe during 23 months of the Crane agreement. He added, "It would require considerable effort to go back and reconstruct my time." Crane described several activities that were performed to benefit the Tribe. The court asked if there was any corroboration of the hours and the work performed. Crane stated there was not, because relationships were built over many years, but an agreement could be reached in minutes, so the hourly billing model did not provide fair compensation. Even though the Crane agreement contemplated the potential for quantum meruit recovery, Crane admitted that the firm did not keep time sheets for any client and did not have time records to support their work.

## Punitive Damages Phase, Judgment, and Statement of Decision

On November 8, 2018, the trial court ruled in favor of the Tribe and against Stein, Law Offices, and SMDC, on all causes of action in the Tribe's complaint. The court found Stein, Law Offices, and SMDC acted with malice, oppression, and fraud, so held a third phase of trial on the issue of punitive damages, described in more detail in the discussion.

On August 27, 2019, the trial court issued a statement of decision. The court noted that the following pleadings were at issue: the Tribe's fourth amended complaint, Stein and SMDC's September 26, 2007 cross-complaint, SMDC's amended complaint, Dunlap's cross-complaint, and Crane's complaint. In footnotes, the court explained the dismissals of parties from the various pleadings. The court also noted the original cross-complaint that Stein and SMDC filed in the Tribe's action on August 20, 2007, was never served. The court found there was no evidence that the Tribe was "state recognized" or that the State of California had state recognized tribes.

The court found Stein had committed multiple acts of fraud against the Tribe. Stein committed fraud when he attached a document as exhibit B to the Libra agreement that purported to be a California Senate Bill authored, introduced, and amended by Senator Vincent. Exhibit B led the Tribe, through Carmelo, to believe the Tribe could operate casino gaming in California because actual legislation had been introduced on the Tribe's behalf. Stein failed to disclose to the Tribe that two days after the Libra agreement was executed, the California Legislative Counsel issued an opinion to Senator Vincent that the

34

Legislature had no power to authorize a non-federally recognized Indian tribe to engage in gaming activities, even if the tribe were recognized by the state.

Stein's July 15, 2006 email acknowledged his representation that exhibit B to the Libra agreement was authored by Senator Vincent was a lie. Although he told the Libra investors that the legislation was authored and introduced by a lawmaker, he had lied. Stein admitted at trial that he drafted the document attached as exhibit B. The Tribe did not know whether Senate Bill No.175 had been introduced by Senator Vincent until Stein revealed in the email that he had lied to the Libra investors.

Stein also committed fraud by accusing the Tribal Council of stealing funds and freezing their bank accounts when he had no good faith basis to do so, and after he ceased to have actual authority over any aspect of the Tribe. He committed fraud by omission when he failed to advise the Tribe of the basic fact that the SMDC agreement would be rejected by the federal gaming authority if the Tribe achieved federal recognition, and he failed to advise them because it was against Stein's own interest.

In addition, Stein committed fraud when he caused Candelaria to file a statement of unincorporated association claiming to be a representative of the Tribe, when he had no good faith basis to believe that she had a right to do so. He falsely represented to members of the Tribe that the Candelaria Group acted for the Tribe, knowing the representation to be false, and continued to do so even after the jury found the Tribe, as represented by the Tribal Council, was the real party in interest in the case. Stein had no reasonable basis to believe his representations to be true, but made them knowingly in order to

35

defraud tribal members, potential members, the public, former investors, potential investors, and the court. Stein made these false representations to usurp all of the Tribe's legal rights and obligations. The court found "Stein damaged the Tribe by deceiving the Tribe's members about the split between Stein and the Tribe thereby causing the Libra investors, who had committed to supporting the Tribe, [to withdraw] financial and other support. The loss is more than $18,000,000 which had been pledged by the Libra investors but was lost because of Stein's fraudulent conduct." The Tribe also suffered a loss of reputation, as it was forced to deny Stein's charges that the Tribal Council members had stolen money from the Tribe.

The court found the language of the SMDC agreement disclaiming an attorney-client relationship was not dispositive, and instead, the extensive facts and the law strongly supported finding an attorney-client relationship was created based on the intent and the conduct of the parties. Stein had numerous conflicts of interest. He had a conflict when he advised the Tribe that it did not need to achieve federal recognition to engage in gaming. He violated rule 3-310 when he failed to advise the Tribe that he had an adverse interest. He violated rule 3-300 by failing to advise the Tribe when he acquired a financial interest adverse to the Tribe's interest, that he had to give the Tribe a meaningful opportunity to consult with another lawyer.

Even if Stein were not acting as the Tribe's lawyer, he breached his fiduciary duties to the Tribe through his acts as an officer of the Tribe. He breached his duty of candor. He also breached his fiduciary duties by pursuing a strategy that would not achieve federal recognition for the Tribe because it would affect his rights to recover future gaming revenue. He acted in

36

his own interest and against the tribe's interest because it would be more financially advantageous to him in the long run, despite the Tribe's express desire for federal recognition. Other conduct that breached Stein's fiduciary duties included sending letters to the Tribe membership without the Tribal Council's consent or knowledge, freezing the Tribe's bank account, and demanding the Libra investors pay him instead of the Tribe. Stein was also liable for malpractice based on the same advice, misrepresentations, and actions.

The court found Stein was liable for conversion of the Tribe's property. Stein admitted that he retained possession of the Tribe's membership and financial records after his relationship was unambiguously terminated. He used the information, computers, and documents for his own purposes, including sending letters to financial institutions and the membership to disparage the Tribal Council and gain support for himself. He has not returned the records or computers. The court found the Tribe's damages were established because the Tribe had not been able to use their property for 12 years, diminishing the value of some items and depriving the Tribe of the opportunity to conduct business with others or pursue federal recognition. Stein was also liable for breach of confidence and misappropriation of trade secrets in the form of the confidential membership records.

Stein was liable for intentional interference with the Tribe's economic relationships and prospective economic relationships. Stein and SMDC interfered with the Tribe's contract with the Libra investors. Stein intentionally disrupted the relationship with Libra when he did not get to spend the Libra money in the way that he wanted. He threatened to send

the money back to Libra, rather than continue working with the Tribe. Once Stein's dispute started with the Tribe, Stein and SMDC wanted Libra to pay Stein any monies owed by the Tribe to Stein. Stein and SMDC insisted that they be first in line for payment. By refusing to withdraw until the monies were paid, even though Stein was aware that he had no right to payment from the Libra funds, Stein interrupted the Libra agreement. Because Libra did not deviate from the original intention of its agreement with the Tribe, which had nothing to do with payment to Stein, and did not want to pay Stein, Stein's threat came to fruition. The court added, "Stein's demand to Libra also revealed that Stein and [his attorney] Sulzer had a high degree of confidence that the $18 million that Libra had promised to the Tribe would be forthcoming imminently."

The court found Stein interfered with the Tribe's prospective economic advantage for the same reason. The future economic prospect was the funding that Libra promised to invest in subsequent tranches. Stein wanted the Tribe and Libra to promise to use subsequent tranches to pay him or he would disrupt the relationship. He did disrupt the relationship. The damages were the remainder of the $21 million of Libra funds that Libra had promised to the Tribe but that were cut off because of Stein.

The SMDC agreement was subject to rescission because Stein violated important ethical rules subjecting transactions between attorneys and clients to strict scrutiny for fairness and full disclosure. Stein violated rule 3-300 by acquiring an interest that guaranteed 10 percent of future casino gaming revenue to SMDC, as well as by drafting the SMDC agreement and Tribe resolutions. The Tribe members who reviewed the SMDC

agreement did not understand it, and it was not explained in a manner that they could understand. They were not given copies to review, so had no meaningful opportunity for an independent lawyer to explain it to them. Stein misled the signatories about whether they had an outside lawyer representing them. Stein did not overcome the presumption that the SMDC agreement was without adequate consideration, and therefore, the result of undue influence. If Stein had complied with the rule, independent counsel would have explained to the Tribe that the goals of federal recognition and casino operations were incompatible under the SMDC agreement because of the sole proprietary interest rule that invalidates SMDC's interest. The sole proprietary interest rule is intended to protect Native American tribes from the type of unfairness embodied in the SMDC agreement. The fact that Stein sought to evade the rule by not pursuing federal recognition, which was an important goal of the Tribe, compounded the unfairness. Therefore, the court voided the SMDC agreement at the Tribe's election.

The SMDC agreement was voidable and subject to rescission, but alternatively, Stein breached the SMDC agreement, as well as the implied covenant of good faith and fair dealing. In addition, Stein and SMDC were liable for unfair competition in violation of Business and Professions Code section 17200, based on the claims stated against Stein, including unlawfully retaining the Tribe's books and records, misappropriation of trade secrets, and fraud. As a result, the Tribe was entitled to restitution of the amount paid to Stein and SMDC under the SMDC agreement.

The court found the entity that Stein created for the Candelaria Group existed for the sole purpose of attempting to

deceive tribe members and the public about the true identity of the Tribe, and usurp the Tribe's legal rights and obligations.

Stein, SMDC, and the Law Offices were alter egos. The Law Offices were merely a "doing business as" (d.b.a.) entity for Stein. Stein, the Law Offices, and SMDC shared the same address on Santa Monica Boulevard. They used the same staff services, even though the legal assistant was employed solely by the law office. Stein appointed his legal assistant as a "Tribal Administrator" for the Tribe, and she reported to Stein for all of the various entities. Stein was the sole shareholder and manager of SMDC. SMDC is inadequately capitalized and has no assets whatsoever. Stein disregarded corporate formalities on behalf of SMDC. Stein paid expenses for the Tribe out of SMDC funds or his own pocket. Stein, SMDC, and the Law Offices were one and the same, and must be treated that way for purposes of liability.

Stein's documentation to support his quantum meruit claim was heavily redacted and simply totaled hours that he claimed he worked on behalf of the Tribe. The court was not persuaded that the document represented work that Stein performed on behalf of the Tribe alone and for which he would be entitled to compensation under the SMDC agreement.

The court found by clear and convincing evidence that Stein's conduct, individually and through his alter egos, was fraudulent, despicable, oppressive, and malicious. Extensive evidence of fraud against the Tribe beginning from the inception of the relationship was at the center of the case, as described in more detail in the discussion of punitive damages below. The court awarded $7 million in punitive damages.

The court concluded Stein and SMDC's August 20, 2007 cross-complaint was filed, but never served. There was no proof

of service, despite the court having given Stein leave to file proof of service years after the cross-complaint was filed. Even if the cross-claims were not inoperative for failure to serve it, however, the court found the SMDC agreement was voidable and subject to rescission by the Tribe, so Stein and SMDC's breach of contract claim was extinguished. The remaining claims for account stated and quantum meruit were also extinguished, because Stein failed to provide any persuasive evidence that he did the work that he claimed. He submitted two incomplete, heavily redacted documents that had no indicia of reliability and failed to persuade the court. Stein failed to carry his burden that he did the work claimed, and he refused to provide unredacted copies of the documents. The court inferred that unredacted copies likely contained evidence that Stein billed work for other legal clients and wrongfully charged the Tribe, or that Stein performed extensive legal work for the Tribe as the Tribe's lawyer.

Crane failed to submit competent, persuasive evidence that it performed any work for the Tribe at all. Daniel Crane testified that he did some federal work for the Tribe, but was unable to show any tangible work product that he produced for the Tribe or any evidence that he had actually done any work for the Tribe. The court concluded Crane failed to carry its burden to show it had done the work claimed. In addition, Crane's contract with the Tribe stated no money was due until the Tribe received more than $2 million in investment funds. The Tribe received only one tranche of investment funds totaling $1.8 million. Because the Tribe never acquired more than $2 million in investor funds, due to Stein's interference with the Libra agreement, the obligation to pay Crane was never triggered.

41

On the Tribe's complaint, the court found in favor of the Tribe and against Stein, Law Offices, and SMDC, jointly and severally, as to all causes of action. The SMDC agreement was rescinded and void. The court enjoined the defendants from retaining possession or control of any files, documents, or other property belonging to the Tribe, including the Tribe's membership records, financial records, internet domain name, and website. The defendants were also enjoined from using the Tribe's confidential information, including membership records and financial information. Stein, Law Offices, and SMDC were also prohibited from: contacting or soliciting any member of the Tribe for any purpose relating to any tribal membership or casino gaming project; disclosing or disseminating any of the Tribe's confidential information; destroying or otherwise making unavailable to the Tribe any documentary, computer, or other evidence relevant to the litigation in the defendants' control; holding themselves out to be the office of, or affiliated with, the Tribe; or executing on any order or writ for the Tribe's property. The court ordered the defendants to deliver all of the Tribe's information, computers, and electronic equipment within 30 days of service of the judgment.

On the causes of action for conversion, breach of fiduciary duty, misappropriation of trade secrets, breach of confidence, intentional and negligent interference with economic relationships, legal malpractice, violation of the Penal Code, unfair competition, and fraud, the court ordered judgment in favor of the Tribe and against Stein, Law Offices, and SMDC, jointly and severally, in the amount of $20,411,067.23. The statement of decision erroneously stated the calculation of damages was based on $21,000,000, minus $800,000 attributed to

Libra, $161,067.23 paid to the Tribe, and $50,000 paid Crane. On the declaratory relief cause of action, the court declared that the Tribe was the real party in interest with standing to pursue the litigation. On the cause of action for alter ego liability, the court found Stein, Law Offices, and SMDC were alter egos, jointly and severally liable for the obligations of each other. The Tribe was entitled to recover attorney fees and costs. In addition, Stein, Law Offices, and SMDC acted with malice, oppression, and fraud.

On Stein and SMDC's September 26, 2017 cross-complaint, the court found in favor of Aronson, Polanco, and each of the Tribal Council members, and against Stein, Law Offices, and SMDC.

On SMDC's complaint, the court found in favor of Aronson, Polanco, and each of the Tribal Council members on all causes of action. On Dunlap's cross-complaint, the court found against Dunlap on all causes of action.

On Crane's complaint, the court found against Crane on the causes of action for interference with contractual relations and fraudulent conveyance, in favor of Aronson, Polanco, and each of the Tribal Council members.

The court ordered Stein, the Law Offices, and SMDC, jointly and severally, to pay punitive damages of $7 million to the Tribe.

That same day, on August 27, 2019, the trial court entered judgment consistent with the statement of decision. Stein and SMDC filed a motion for new trial, which was denied by Judge David S. Cunningham, III. Stein, SMDC, and Crane filed a timely notice of appeal from the judgment.

43

## DISCUSSION

## <u>Standard of Review</u>

The substantial evidence standard of review applies to appeals challenging factual findings in a jury or bench trial. (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143.) "Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "A single witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Ibid.*)

" 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Thompson v. Asomos*, *supra*, 6 Cal.App.5th at p. 981.)

"Matters presenting pure questions of law, not involving the resolution of disputed facts, are subject to de novo review." (*Shewry v. Begil* (2005) 128 Cal.App.4th 639, 642.)

44

## Statement of Decision

Stein and SMDC contend that the statement of decision should not be afforded any deference on appeal, because the trial court adopted the statement of decision proposed by the Tribe without making any of the changes suggested by Stein and SMDC. Although Stein and SMDC have failed to explain the relevance of their contention as to any specific issue, we conclude their analysis is incorrect.

Under Code of Civil Procedure section 632, upon a party's request after trial, the court must issue a statement of decision "explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial." Under Code of Civil Procedure section 634, if the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, "it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue."

Even when the procedures specified in Code of Civil Procedure sections 632 and 634 have been followed, the "trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379–1380.) "In addition, '[e]ven though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party

45

which would have the effect of countervailing or destroying other findings.'" (*Thompson v. Asimos*, *supra*, 6 Cal.App.5th at p. 983.)

"The trial court is specifically authorized to designate a party to prepare the statement of decision [citations] and thus is required only to review the statement and any objections thereto and to make or order to be made any corrections, additions, or deletions it deems necessary or appropriate." (*Miramar Hotel Corp. v. Frank B. Hall & Co.* (1985) 163 Cal.App.3d 1126, 1129.)

In this case, the trial court provided the proper statutory procedures. There is no evidence that the trial court did not read the statement of decision prepared by the Tribe or review the objections made by Stein and SMDC. Stein and SMDC have not shown that any finding in the statement of decision failed to properly reflect the decision of the trial court. In fact, Stein and SMDC contend this court may review their contentions on appeal de novo because the facts are undisputed.

## Rescission of the SMDC Agreement

Stein contends the trial court erred in rescinding the SMDC agreement based on a violation of former rule 3-300 for several reasons: (1) there was no implied attorney-client relationship, because the SMDC agreement expressly provided that Stein was not the Tribe's attorney; (2) the requirements of former rule 3-300 were met, and the Tribe affirmed that the SMDC agreement was valid, binding, and enforceable, or waived its right to rescind; and (3) even if the SMDC agreement were properly rescinded, SMDC was entitled to compensation. We conclude substantial evidence supports the trial court's findings on rescission.

46

### A. Implied Attorney-client Relationship

Stein's first contention is that no attorney-client relationship existed between himself and the Tribe. However, substantial evidence supports the trial court's finding of an implied attorney-client relationship.

The practice of law includes providing legal advice and preparing legal instruments and contracts that secure legal rights, in addition to performing services in court. (*Benninghoff v. Superior Court* (2006) 136 Cal.App.4th 61, 68.) An attorney-client relationship can only be created by express or implied contract. (*Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 729.)

A lawyer may provide nonlegal services without creating an attorney-client relationship or may limit the scope of representation to certain matters, but a contract provision that purports not to create an attorney-client relationship does not by itself prevent the existence of an attorney-client relationship. (*Benninghoff v. Superior Court*, *supra*, 136 Cal.App.4th at p. 73 & fn. 10.) It is the legal effect of an instrument, rather than the label that the parties place on their relationship, that determines the nature of the agreement. (*Ibid*.; see State Bar Standing Com. on Prof. Responsibility and Conduct, Formal Opn. No. 1999–154 [lawyer performing nonlegal services may disclaim intent to provide legal services, but disclaimer is not effective if lawyer in fact performs legal services or offers legal advice].)

"In determining the existence of an attorney-client relationship we should ask whether the 'totality of the circumstances' so indicate. [Citation.] 'The question of whether

an attorney-client relationship exists is one of law. [Citations.] However, when the evidence is conflicting, the factual basis for the determination must be determined before the legal question is addressed.' " (*Koo v. Rubio's Restaurants, Inc.*, *supra*, 109 Cal.App.4th at p. 732.)

In this case, the trial court found the language of the SMDC agreement disclaiming an attorney-client relationship was not dispositive. Extensive facts strongly supported finding an attorney-client relationship was created based on the intent and the conduct of the parties. From the beginning, Stein stated that he kept internal records of his time for a fair and accurate measure of the legal costs to be charged against each financing transaction. Stein hired all of the Tribe's outside attorneys, supervised their work closely, and fired them. At times, Stein drafted documents for the Tribe and was the sole attorney to provide advice about important legal transactions. Tribe members believed Stein was acting as the Tribe's attorney, and when tribe members referred to Stein as the Tribe's attorney, he did not correct them. There was ample evidence of an implied attorney-client relationship from the parties' intent and conduct.

## B. Former Rule 3-300

Stein contends that even if an attorney-client relationship existed, the requirements of former rule 3-300 were met. We conclude substantial evidence supports the trial court's finding that Stein's violation of former rule 3-300 permits rescission of the SMDC agreement.

Former rule 3-300, which has been revised and renumbered as current rule 1.8.1, governs an attorney's obligations when

48

entering into a business transaction with a client.  At the time
that the parties executed the SMDC agreement, former rule 3-
300 provided:  "A member shall not enter into a business
transaction with a client; or knowingly acquire an ownership,
possessory, security, or other pecuniary interest adverse to a
client, unless each of the following requirements has been
satisfied:  [¶]  (A) The transaction or acquisition and its terms are
fair and reasonable to the client and are fully disclosed and
transmitted in writing to the client in a manner which should
reasonably have been understood by the client; and  [¶]  (B) The
client is advised in writing that the client may seek the advice of
an independent lawyer of the client's choice and is given a
reasonable opportunity to seek that advice; and  [¶]  (C) The
client thereafter consents in writing to the terms of the
transaction or the terms of the acquisition."

A " 'transaction between an attorney and client which
occurs during the relationship and which is advantageous to the
attorney is presumed to violate that fiduciary duty and to have
been entered into without sufficient consideration and under
undue influence.' [Citation.]  As explained long ago in *Felton v.
Le Breton* (1891) 92 Cal. 457, 469:  'While an attorney is not
prohibited from having business transactions with his client, yet,
inasmuch as the relation of attorney and client is one wherein the
attorney is apt to have very great influence over the client,
especially in transactions which are a part of or intimately
connected with the very business in reference to which the
relation exists, such transactions are always scrutinized by
courts with jealous care, and are set aside at the mere instance of
the client, unless the attorney can show by extrinsic evidence
that his client acted with full knowledge of all the facts connected

49

with such transaction, and fully understood their effect; and in any attempt by the attorney to enforce an agreement on the part of the client growing out of such transaction, the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised.'" (*BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227–1228.)

The SMDC agreement provided Stein with a substantial financial interest adverse to the Tribe's interest in obtaining federal recognition, yet Stein did not explain his adverse interest or give the Tribe a reasonable opportunity to seek the advice of an independent attorney. Instead, Stein misrepresented that attorney Otto was acting as the Tribe's counsel, knowing that Otto expressly refused to represent the Tribe. The trial court concluded that Stein deliberately lied to the Tribe about Otto acting as their lawyer to induce the Tribe to sign the SMDC agreement without the benefit of counsel and to take advantage of the Tribe. When Stein presented the SMDC agreement to the Tribe, the Tribal Council members were not given time to read the document, take it home, or have a meaningful opportunity for an independent lawyer to review it. They signed the document under duress, without the benefit of counsel, and without understanding that Stein's interest was adverse to the Tribe's goal of federal recognition. Substantial evidence supported the trial court's conclusion that Stein violated former rule 3-300, and as a result, the SMDC agreement was voidable by the Tribe.

### C. Waiver

Stein further contends that the Tribe waived its right to rescind, because the Tribe knew all the facts on which rescission was sought, but delayed rescinding. This is incorrect.

"The general rule is that a defrauded party must exercise his election to rescind with reasonable promptness after discovering the fraud. A delay in rescission is evidence of a waiver of the fraud and an election to treat the contract as subsisting. Any acts indicating an intent to abide by the contract are evidence of an affirmance thereof and of a waiver of the right to rescind." (*Le Clercq v. Michael* (1948) 88 Cal.App.2d 700, 702.)

The trial court's implied finding that the Tribe did not delay in rescinding the agreement is supported by substantial evidence. There was no evidence that an independent lawyer explained the consequences of the SMDC agreement to the Tribe prior to litigation, including Stein's conflict of interest and that federal recognition was incompatible with the SMDC agreement, because SMDC's interest would be invalidated. There is no evidence that the Tribe delayed rescission of the SMDC agreement once the Tribe understood the basis for rescission. Resolutions prepared by Stein, or by attorneys under Stein's close direction, adopting and ratifying amendments to the SMDC agreement were no substitute for a meaningful opportunity to obtain the advice of an independent attorney about the consequences of the agreement. Substantial evidence supports the trial court's conclusion that the Tribe did not delay in seeking rescission.

### D. Unjust Enrichment

Stein further contends that by rescinding the SMDC agreement and denying any measure of compensation to Stein, the Tribe was unjustly enriched. The trial court found, however, that Stein failed to introduce credible evidence necessary to recover compensation. Stein's documentation for his quantum meruit claim was heavily redacted and simply totaled hours that he claimed to have worked on behalf of the Tribe. The trial court concluded the documentation did not represent work that Stein performed solely on behalf of the Tribe and for which he would be entitled to compensation under the SMDC agreement. On appeal, Stein failed to address the trial court's express findings and instead based his argument for compensation on the same quantum meruit documentation that the trial court rejected below. No error has been shown.

### Fraud

Stein and SMDC contend the trial court's finding that they are liable for damages caused by a series of fraudulent acts designed to deceive the Tribe is not supported by substantial evidence. We disagree.

### A. Misrepresentations

The elements of fraud are: a misrepresentation (false representation, concealment, or nondisclosure); knowledge that the misrepresentation is false; intent to induce reliance on the misrepresentation; justifiable reliance; and damages as a result

of the misrepresentation. (*Cohen v. Kabbalah Centre Internat., Inc* (2019) 35 Cal.App.5th 13, 20; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.)

The trial court identified a series of misrepresentations Stein made in as part of a scheme to defraud the Tribe and usurp its rights. For example, Stein represented that exhibit B to the Libra agreement was gaming legislation drafted by the office of a California State Senator. Stein knew this representation was false, because he created the draft, which had never been introduced as legislation on behalf of the Tribe. He intended the parties to the Libra agreement to rely on his representation that Senator Vincent had authored the legislation. The Tribe was justified in relying on Stein's representation, because although the draft attached to the Libra agreement was incomplete, it showed that legislation had been introduced and amended previously. There was no indication that prior versions of the legislation did not relate to the Tribe. As a result of Stein's misrepresentation that exhibit B was legislation authored and supported by a State Senator, the Tribe entered into an agreement that provided Libra with substantial revenue rights in exchange for investment funding, and the Tribe agreed to conditions in the Libra agreement that required enactment of exhibit B or similar legislation.

In addition, Stein misrepresented in the Libra agreement that the Tribe was a "state recognized" Indian tribe. Stein knew his representation was false, but the Tribe justifiably relied on Stein's counsel and expertise. Based on Stein's misrepresentation, the Tribe provided revenue rights to Libra in exchange for funding that was conditioned on the fact that the Tribe had been and continued to be recognized by the State of

California as an Indian tribe.  Stein's misrepresentations about state recognition damaged the Tribe by diverting resources from the effort to attain federal recognition.

Stein made additional false representations when he sent letters accusing Tribal Council members of malfeasance and registered an unincorporated association in the name of the Tribe, creating confusion that hindered the Tribe's ability to conduct its affairs with tribe members, Libra, the court, and the public.  Stein was aware that the Candelaria Group did not control the Tribe's rights and obligations, but he intended to deceive tribe members and others in order to assert control of the Tribe's rights.  Tribe members reasonably relied on his false representations.  Ultimately, a jury trial was required to resolve the identity issues that Stein created.  The trial court's conclusion that the Tribe was damaged because the Libra investors declined to provide further funding as a result of Stein's false representations about the identity and actions of the Tribe, was supported by substantial evidence.

## B.  Lost Funding

Stein and SMDC contend that the Tribe was not damaged by Stein's fraudulent acts, because additional Libra funding was contingent on conditions that the Tribe did not and could not fulfill.  We conclude substantial evidence supports the trial court's finding that the Tribe would have received additional investment funding in the absence of Stein's fraudulent actions.  In addition, Stein contends the Tribe failed to show it could have

built a profitable casino, but no damages were awarded for lost profits.

 " 'There are two measures of damages for fraud:  out of pocket and benefit of the bargain.  [Citation.]  The "out-of-pocket" measure of damages "is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.  The 'benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive." ' (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240 (*Alliance Mortgage*); see *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 646 ['Because of the extra measure of blameworthiness inherent in fraud, and because in fraud cases we are not concerned about the need for "predictability about the cost of contractual relationships" [citation], fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit-of-the-bargain damages.'].)"  (*Moore v. Teed* (2020) 48 Cal.App.5th 280, 287–288 (*Moore*).)

 "*Alliance Mortgage* and other authorities have recognized that where the defrauding party stands in a fiduciary relationship with the victim of fraud, a 'broader' measure of damages may be awarded than simply 'out-of-pocket' losses." (*Moore*, *supra*, 48 Cal.App.5th at p. 289.)  "Under Civil Code section 1709, a defendant who willfully deceives a plaintiff with the intent to induce him to alter his position to his detriment 'is

liable for any damage which he thereby suffers.'  Civil Code section 3333, the general tort damage measure, provides that the 'measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.' " (*Ibid*.)

" 'Whatever its measure in a given case, it is fundamental that "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.  [Citations.]" [Citations.]  However, recovery is allowed if claimed benefits are reasonably certain to have been realized but for the wrongful act of the opposing party.' " (*Moore, supra*, 48 Cal.App.5th at p. 292.)

In this case, Libra agreed to provide funding in exchange for an interest in the Tribe's future gaming revenue, and $19 million remained to be received by the Tribe.  The amount stated in the contract was not speculative or imaginary.  Stein and SMDC contend that Stein's fraud did not prevent the Tribe from receiving additional funds, because funding was contingent on conditions that the Tribe did not and could not fulfill.  Stein cannot, however, defeat the Tribe's claim for damages by relying on conditions included in the agreement as a result of his fraud, including the failure to pass legislation substantially similar to exhibit B, or conditions that his fraud prevented the Tribe from fulfilling, such as the dispute he created over control of the Tribe.  Stein and SMDC have not identified any condition outside of those related to Stein's misrepresentations that independently prevented the Tribe from receiving further funding under the Libra agreement.

In addition, substantial evidence supports the trial court's finding that the Tribe would have received the additional funding

56

set forth in the Libra agreement, because either the conditions listed in the agreement were not prerequisite to further funding, or Libra impliedly waived the conditions. The parties' communications with Libra in the summer of 2006 show that the passage of successful legislation and the other conditions listed in the Libra agreement were not required to be met before Libra would provide further funding to the Tribe. Stein was aware that Senator Vincent refused to introduce legislation on behalf of the Tribe and no legislation had been passed, but he worked with Libra and the Tribe to submit a request for the next tranche of funding in September 2006. Legislation was introduced by a different legislator and the legislative process continued. On September 26, 2006, Stein stated that disputes over the Tribe's expenditures endangered the next $2.5 million in funding from Libra, which hung in the balance. In other words, Stein did not believe that any prerequisite condition in the Libra agreement prevented the Tribe from receiving additional funding other than the dispute that he created over the use of the funds. Several conditions in the Libra agreement had not been met when the Libra representatives completed revisions to the Tribe's request for further funding. When the Tribe met with Libra in September 2006, Libra assured the Tribe that despite Stein's statements, there were no problems with the Tribe's actions as long as the Tribe followed the contract. From these communications, we conclude that none of the parties considered the Tribe's expenditures, the failure to pass legislation, or any other condition stated in the Libra agreement to be an obstacle to the receipt of further investment funds. Either Libra never considered the contract conditions to be prerequisites to further funding, or Libra impliedly waived compliance with the

conditions. When Stein created confusion about control of the Tribe, Libra reasonably relied on Stein's false representations to decline to provide further funding until the disputes were resolved. The limited term of the Libra agreement expired before the disputes were resolved. Stein and SMDC's fraudulent acts directly caused Libra to decline to provide further funding to the Tribe. The Tribe was entitled to recover the amount of the Libra agreement under the measure of damages for fraud.

Stein further contends that in order to establish damages from the loss of the Libra investment, the Tribe had to show that it would have been able to build a casino and that the casino would have been profitable. This is incorrect. The Tribe provided valuable revenue rights to Libra in exchange for investment funding, which was not dependent on the Tribe constructing a profitable casino and which did not require the Tribe to reimburse funds if a casino were not built. The Tribe was entitled to recover the amount of the Libra investment that they did not receive as a result of Stein's fraudulent acts. No amount was awarded as lost profits of the planned casino operation. The compensatory damages based on the lost investment funding were not too speculative.

## Calculation of Compensatory Damages

Stein contends the compensatory damages award of $20,411,067.23 is not supported by substantial evidence. The Tribe concedes in its respondent's brief that the statement of decision erroneously described the calculation of damages based on the full amount of the Libra investment of $21,000,000, minus $800,000 received from Libra, $161,067.23 paid by the Tribe to

SMDC, and $50,000 paid Crane.  We conclude the amount of compensatory damages must be reduced to reflect the evidence of damages at trial.

The undisputed evidence established that the Tribe received the initial round of investment funding provided under the Libra agreement, and the trial court found that Stein's fraudulent actions prevented the Tribe from receiving the remaining anticipated funding totaling $19 million.  Further evidence showed the Tribe paid $161,067.23 to SMDC under the SMDC agreement that the Tribe was entitled to recover based on rescission of the SMDC agreement.  No basis has been provided on appeal, however, for including the Tribe's payment of $50,000 to Crane in the damages calculation.  The Tribe did not bring an action against Crane, and Crane was not an alter ego of Stein.  Although the trial court found Stein was liable for breach of fiduciary duty, no argument has been made on appeal that Stein was required to reimburse the Tribe for the payment made to Crane.  The amount of compensatory damages awarded in the judgment must be reduced to $19,161.067.23, the total amount of compensatory damages supported by the evidence.

## Punitive Damages

Stein and SMDC contend that the award of punitive damages is not supported by evidence of Stein's net worth.  We conclude no error has been shown.

59

## A. Additional Facts

The trial court scheduled the punitive damages phase to begin on December 10, 2018.  The court assumed that the Tribe requested financial documents prior to trial, so ordered Stein, the Law Offices, and SMDC to disclose financial records to the Tribe no later than November 15, 2018.  The court ordered the parties to appear for the trial, as well as the accountants for Stein, the Law Offices, and SMDC.

Stein obtained new counsel.  In response to the court's order, Stein produced bank records for one account and two credit cards for the year 2018.  He submitted a statement to the court that he would not appear for the punitive damages phase due to his medical condition, and he waived his right to appear personally for the remainder of the trial, but he offered to respond to written questions under oath.

On December 10, 2018, the Tribe objected that Stein failed to comply with the court's order to disclose financial records.  For example, no records of his real property assets had been provided.  Stein's attorney argued that the Tribe failed to take the steps necessary to prepare for the punitive damages phase of trial.  The Tribe had not filed and served a notice to appear asking for specific records relevant to the punitive damages phase of trial.  The attorney argued that the court's order to produce financial records was also vague.  Financial records were bank statements or brokerage statements.  Judgments obtained by the Law Offices and property deeds were not financial records.  The Tribe argued that the court's order to produce information made it was incumbent on the parties to meet and confer to fulfill the order.  Stein's attorney offered to provide further discovery.  The trial

60

court allowed the Tribe to request production of 15 categories of documents and to propound 50 questions for Stein to answer in writing.

Trial on the issue of punitive damages began on April 5, 2019. The Tribe requested a punitive damages award of $10 million. In discovery responses, Stein claimed to own one percent of a single property in Santa Barbara. Stein provided verified responses to discovery under penalty of perjury that he had never had an ownership interest in a property on Ashland Avenue in Santa Monica, which was held in his wife's name. The Tribe argued, however, that Stein had significant property holdings in his own name in California. The Tribe asked the court to take judicial notice of the fact that Stein owned three real properties in California, despite his representations in discovery. An interspousal transfer deed Stein provided in discovery showed he transferred his interest in the Ashland Avenue property to his wife on May 7, 2012, during the pendency of the litigation. Stein and his wife were listed as joint owners of real property on Murrell Road in Santa Barbara, an address that Stein listed for himself at one point during litigation, with an assessed value of $1 million. In addition, Stein and his wife acquired another property in Santa Barbara on January 7, 2019. The purchase price was $830,000, and the mortgage for the property was $580,000.

The Tribe's attorney noted that when Stein apologized to the court on January 22, 2016, for being underprepared, his excuse was that he was managing a seven-figure transaction as part of overseeing the American branch of his father-in-law's business, as well as negotiating a seven-figure settlement in a case in New Orleans. In addition, Stein had filed an action

against a former client for $400,000 in unpaid fees. The client's cross-complaint had alleged payment of $750,000 to Stein. A 2017 notice of settlement in the fees case included a confidentiality provision, which prevented the Tribe from learning additional information. The Tribe inferred from the numbers alleged in the pleadings that Stein earned approximately $1 million in a single year from one client. The Tribe noted that Stein had not described any income from his father-in-law's Chinese companies and Chinese assets in America. He also had not provided any responses about the settlement of litigation in New Orleans. The Tribe argued that the court could reasonably infer Stein's annual income was $2 million or $3 million per year.

Stein's attorney responded that the Tribe's evidence amounted to speculation, rather than evidence of net worth. Assets owned by Stein's family members were not evidence of Stein's net worth. Having a case that generated a large settlement or managing another person's assets did not cause the assets to belong to the attorney. The Tribe had not even shown that Stein had the ability to pay the judgment of approximately $20 million that had been ordered. The records provided in discovery showed Stein's income was $750,000 in some years and far less after expenses and taxes in other years.

## B. Statement of Decision

In the statement of decision, the trial court found by clear and convincing evidence that Stein's conduct, individually and through his alter ego SMDC and his law office, was fraudulent, despicable, oppressive, and malicious. His fraud against the

Tribe began from the inception of the relationship. He told the Tribal Council that attorney Otto would serve as their general counsel to advise them on the SMDC agreement after Otto expressly told Stein that he would not serve in that role. The fraud continued when Stein gave the Tribe advice that they were a state recognized tribe, and that their status could give them the right to engage in gaming in California without federal recognition. The fraud continued after the relationship ended and litigation started, when Stein took the Tribe's identity using their membership records, registered a different group under their name, and tried to settle the instant lawsuit. Evidence of fraud was extensive and at the center of the case.

The court also found Stein engaged in oppressive and malicious conduct. Stein located the Tribe's offices in his law office and gave his legal assistant the job of Tribal Administrator in order to control the Tribe's legal and financial affairs. Among Stein's worst actions was his failure to return the Tribe's original birth and family records after he resigned and was fired. By keeping the records, he prevented the Tribe from pursuing federal recognition, which was a 25-to-30-year process. Nearly 15 to 20 years later, Stein had still not returned the records.

Stein was a recidivist, as he targeted other Native American groups to prey upon. Repeated actions may be punished more severely than isolated incidents. He also used his status as a lawyer in a position of trust as a weapon against a less sophisticated client, and used litigation as a weapon against the Morales Group and the Tribe.

During the punitive damages phase, Stein failed to provide evidence of his assets and failed to be candid about his assets under oath. He provided little evidence of his net worth. Stein

63

refused to take the stand or appear on April 5, 2019, to answer questions regarding his financial condition, so the Tribe had no meaningful opportunity to cross-examine him on this topic. He presented only a chart to illustrate his net worth, which had no supporting information and was unreliable. Relying on other information in the record, the court found Stein had ample ability to pay a multi-million dollar judgment. On the record on July 22, 2016, Stein represented that he was involved in several "seven figure" transactions and settlements, including substantial transactions that Stein handled for his father-in-law's office in China and settlements in legal matters. In discovery responses during the punitive damages phase, Stein failed to describe the income received from his father-in-law, Chinese assets in America, or any of the very high net value matters that he was engaged in that he had described to the court on the record on July 22, 2016. The court considered his prior statements and concluded Stein was untruthful about his ability to pay a judgment or punitive damages.

The court placed a value on the holdings that Stein previously mentioned equal to $3 million. Stein's family had substantial real estate holdings as well. Stein had significant property holdings in California in his own name, which showed his discovery responses had been less than candid. Stein transferred ownership of a property in Santa Monica to his wife on May 7, 2012, during the pendency of the litigation. He and his wife were listed as joint owners of property in Santa Barbara assessed at $1 million. Stein stated the properties were largely in his wife's name or belonged to his wife's family, but he lived at the properties and did not report any rent. Stein had been undeterred from his lawless behavior, evasiveness, and

untruthfulness to opposing parties and the court. He was not sorry or contrite, had no misgivings about anything that occurred, refused to change his conduct, and was undeterred. The court found a $7 million punitive damages award was appropriate, which was a third of the compensatory damages awarded.

### C. Applicable Law

Punitive damages are recoverable in fraud actions involving intentional misrepresentations. (*Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1241.) The United States Supreme Court has developed "a set of substantive guideposts that reviewing courts must consider in evaluating the size of punitive damages awards: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' [Citation.] A trial court conducts this inquiry in the first instance; its application of the factors is subject to de novo review on appeal." (*Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 371–372.)

" 'Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages. [Citation.] We examine the record to determine whether the challenged award rests upon substantial evidence. [Citations.] If it does not, and if the plaintiffs had a full and fair opportunity to make the requisite showing, the proper remedy is to reverse the award.' "

(*Farmers & Merchants Trust Co. v. Vanetik* (2019) 33 Cal.App.5th 638, 647–648.)

"The ultimately proper level of punitive damages is an amount not so low that the defendant can absorb it with little or no discomfort [citation], nor so high that it destroys, annihilates, or cripples the defendant." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 621–622.)

" '[I]f a plaintiff is unable to provide the court with evidence due to the defendant's failure to comply with discovery obligations, then punitive damages may be awarded without the requisite evidence.' " (*Farmers & Merchants Trust Co. v. Vanetik, supra,* 33 Cal.App.5th at p. 650.) "In *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, the appellate court held that a trial court may permit the discovery of a defendant's financial condition after liability has been determined, even if the plaintiff did not file a motion for pretrial discovery of financial condition. [Citation.] After the trial court ruled in favor of the plaintiff in a bench trial, it ordered the defendant to bring records regarding his net worth to the court the next day. [Citation.] The defendant failed to do so, and the trial court awarded punitive damages to the plaintiff using a multiplier of the compensatory damages. [Citation.] 'So long as the trial court allows the defendant sufficient time, following a determination of liability, to collect his or her financial records for presentation on the issue of the amount of such damages to be awarded, there is nothing prejudicial or unfair about using such a process to try the issue of the amount of punitive damages.' " (*Farmers & Merchants Trust Co.*, at p. 651.)

66

### D. Analysis

Stein and SMDC contend in a single sentence in their opening brief that the conduct at issue was not reprehensible and the Tribe did not suffer damages. The trial court found the conduct was reprehensible, however, because among other conduct, Stein withheld the Tribe's original records and was a recidivist who repeatedly targeted Native American groups. As discussed above, substantial evidence supports the trial court's finding that the Tribe was damaged.

Stein and SMDC's primary challenge to punitive damages is their contention that the amount of the award was excessive and not supported by evidence of Stein's net worth. The trial court concluded the evidence that Stein and SMDC provided to the Tribe in discovery about Stein's financial condition was not credible. Although insufficient credible, admissible evidence was presented about the current financial condition of Stein, Law Offices, and SMDC, the trial court found Stein and SMDC were estopped from complaining about the absence of evidence because they failed to produce credible evidence of their finances. Stein had not provided evidence of any compensation for the significant work that he represented he performed to manage the American branch of his father-in-law's Chinese company. He transferred substantial assets to his wife's name during the pendency of the litigation, and the amount of punitive damages assessed was reasonably related to the amount of compensatory damages. Stein chose not to appear and testify during the punitive damages phase of the trial, which could have provided clarity about the missing information. The trial court did not abuse its

67

discretion in finding that Stein and SMDC were estopped from objecting to the lack of evidence of net worth.

## Conversion and Remaining Theories

Stein and SMDC contend that the trial court's findings on conversion are not supported by substantial evidence, because the Tribe was not deprived of any documents. Stein and SMDC simply rely on their own evidence, however, contrary to the standard of review on appeal. The trial court found Stein and SMDC withheld records that should have been returned to the Tribe, and substantial evidence supports the trial court's finding. Stein withheld and used the Tribe's records to contact tribe members directly, without the Tribe's authorization. No error has been shown as to the finding of conversion.

Because the remedies provided to the Tribe in the judgment are fully supported by the trial court's findings on the claims for rescission, fraud, and conversion, we need not consider whether the same remedies were equally supported under other theories of recovery.

## Dismissal of SMDC Complaint and Cross-complaint

Stein and SMDC contend that the trial court incorrectly concluded SMDC dismissed claims against the Tribe from its complaint, and Stein and SMDC dismissed claims against the Tribe from the September 2007 cross-complaint. We agree with the trial court that the claims alleged against the Tribe were dismissed from both the SMDC complaint and the September 2007 cross-complaint.

When Stein and SMDC filed their pleadings, they were aware of the identity of the party that they intended to name as a defendant. As their pleadings acknowledged, that party had been referred to at different times during the parties interactions as the Gabrielino-Tongva Nation or the Gabrielino-Tongva Tribe. The SMDC agreement that Stein drafted in 2001 referred to the contracting party as the "Gabrielino-Tongva Nation," but the resolutions adopting the agreement and subsequent amendments to the agreement were executed on behalf of the "Gabrielino-Tongva Tribe." SMDC's complaint was brought against the "Gabrielino-Tongva Tribe," but its amended complaint named the "Gabrielino/Tongva Nation, also known as Gabrielino-Tongva Tribe, also known as Gabrielino Tribal Gaming Authority." The September 2007 cross-complaint was brought against the "Gabrielino/Tongva Nation, formerly known as Gabrielino-Tongva Tribe, formerly known as Gabrielino Tribal Gaming Authority."

Stein and SMDC were aware that the elected Tribal Council members executed resolutions adopting amendments to the SMDC agreement, terminated Stein, and caused the Tribe to file litigation against Stein and SMDC. After litigation commenced, Stein and SMDC entered into a settlement agreement with a different group of tribe members. Stein and SMDC chose to file notices dismissing all their claims against the entity named in their pleadings as "Gabrielino-Tongva Tribe" without any qualification or limitation. The jury's finding that the Tribe had standing to litigate the claims in the Tribe's complaint did not restore claims that Stein and SMDC dismissed from their pleadings. SMDC's substitution of "Gabrielino/Tongva Nation" for a Doe defendant during the course of litigation was

69

not effective to refer to the Tribe, because the Tribe was already a named defendant in the litigation.

We note that the trial court allowed Stein and SMDC to present their claims at trial. After a full trial on the merits, the trial court not only found the claims against the Tribe had been dismissed, but that their claims failed on the merits as well. Stein and SMDC contend that the trial court failed to rule on indemnity claims in the cross-complaint against the individual defendants. However, the trial court expressly listed the September 2007 cross-complaint as a pleading for determination at trial, and found against Stein and SMDC on the claims in the cross-complaint against the individual defendants. Stein and SMDC have not met their burden on appeal to show error as to any claim against the individual defendants that was presented to the trial court for determination.

## Dismissal of Crane Complaint

Crane similarly contends that it did not dismiss claims against the Tribe, but only dismissed the Candelaria Group. This is incorrect. Crane filed an action against the "Gabrielino-Tongva Tribe", and individual defendants based on the Crane agreement. The named defendant in Crane's lawsuit was the contracting party, and Crane subsequently dismissed all claims against "Gabrielino-Tongva Tribe." At the time that Crane filed its dismissal, Crane was aware competing groups claimed authority to act for the Tribe, but Crane did not qualify or limit its dismissal. The Candelaria Group was not a party to the Crane agreement and was not named as a defendant in Crane's lawsuit.

70

Crane asserts that two earlier unpublished opinions in this case establish as law of the case that the Tribe split into two groups. This is incorrect. Both opinions expressly found triable issues of material fact required the appellate court to reverse summary judgments; neither case affirmed a finding of fact made by the trial court. After further proceedings in the trial court, the jury found that the Tribe had standing and the capacity to sue. The jury's finding did not affect Crane's dismissal of claims against the Tribe.

Although the trial court ultimately found Crane's claims against the Tribe had been dismissed, Crane was permitted to present its claims at trial. The court found against Crane on the merits as well. The Crane agreement provided for monthly fees to accrue "until such time as the Tribe secures an Investor for the proposed casino and gaming establishment and receives payment of at [least] $2 million. Once an investor has been secured and the $2 million has been paid, the Tribe will pay [Crane] all previous monthly fees accrued and the subsequent monthly fees on a monthly basis" until a specific date. The trial court found the payment term of the Crane agreement was not triggered, because the Tribe did not receive $2 million in investment funding. The evidence supported finding that the Tribe received less than $2 million from the first tranche of investment fundings and no further funding.

To the extent the provisions of the Crane agreement were ambiguous, the trial court's finding that payment was required when the Tribe received funding of $2 million was supported by substantial evidence. Crane contends that by making a partial payment of $50,000, the Tribe waived its right to rely on the condition necessary for the remaining payments, but the evidence

71

showed that Stein unilaterally paid the funds to Crane on behalf of the Tribe. There was no evidence of waiver by the Tribe of the prerequisite conditions to payment.

The trial court's finding that Crane failed to provide proof necessary to recover on claims for quantum meruit or account stated were also supported by substantial evidence. Crane admitted that the firm did not keep the type of time records necessary to establish a quantum meruit claim. He did not attempt to reconstruct the time spent to support the claims.

Crane's claims remaining for trial were against the individual defendants for intentional and negligent interference with contract, and fraudulent conveyance. The trial court found in favor of Carmelo, Alcala, Perez, Machado, Loya, Dunlap, Aronson, and Polanco as to the causes of action remaining on the Crane complaint. On appeal, Crane has not identified any error with respect to the claims alleged against the individual defendants.

## Attorney Fees Award

In a consolidated appeal, Stein, SMDC, and Crane appeal from a postjudgment order awarding attorney fees to the Tribe. We conclude that no error has been shown.

### A. Additional Facts and Procedural History

In December 2019, the Tribe filed a motion for attorney fees and costs, seeking attorney fees of $2,148,428.74 and costs of $103,637.93 from Stein, SMDC, and Crane, jointly and severally. In opposition to the motion for attorney fees and costs, Crane,

Stein, and SMDC argued that the Tribe was not the prevailing party for purposes of an award of attorney fees under Civil Code section 1717, subdivision (b)(2), because the claims against the Tribe were voluntarily dismissed. The Tribe replied that although the claims against the Tribe had been dismissed, Crane, Stein, and SMDC prosecuted the claims through trial, and the court adjudicated the claims in favor of the Tribe. On September 15, 2020, the trial court entered an order awarding attorney fees of $469,427.50 against Stein and SMDC, and attorney fees of $11,900 against Crane. The request for costs was denied.

## B. Reduction in Compensatory Damages

Stein, SMDC, and Crane contend that if the judgment is reversed on the merits, the postjudgment order awarding attorney fees must be reversed as well. Although we have concluded above that the amount of compensatory damages must be reduced and the punitive damages eliminated, this modification does not affect the determination that the Tribe was the prevailing party in the underlying action for the purposes of the attorney fees provisions of the parties' contracts.

## C. Dismissal of Claims

Stein, SMDC, and Crane contend that the trial court incorrectly found that they dismissed their claims against the Tribe. As discussed above, however, the trial court's finding that Stein, SMDC, and Crane dismissed their claims against the Tribe is supported by substantial evidence.

They further contend that the claims in the cross-complaint were not adjudicated against the individual defendants, but as stated above, the claims in the cross-complaint that were presented at trial for determination were fully adjudicated in favor of the individual defendants.

For the first time on appeal from the postjudgment order awarding attorney fees, Stein, SMDC and Crane contend that the Tribe was judicially estopped from arguing that claims against the Tribe were dismissed. They failed to raise this contention on appeal from the judgment and cannot raise it for the first time in connection with the postjudgment order. (See *City of Los Angeles v. Metropolitan Water Dist. of Southern California* (2019) 42 Cal.App.5th 290, 310 [party who failed to appeal from trial court's substantive ruling on standing cannot attempt to raise same fact-dependent arguments in appeal from postjudgment order awarding attorney fees].) We note, however, that the Tribe consistently argued in the trial court that the claims against the Tribe had been dismissed and the only claims pending for trial were those brought by the Tribe.

We also note that Stein, SMDC, and Crane have not raised any argument on appeal that they are not liable for attorney fees under Civil Code section 1717, subdivision (b)(2), because they voluntarily dismissed their claims against the Tribe. Although the claims were dismissed, Stein, SMDC, and Crane successfully argued in the trial court that the identity of the party that they dismissed, as well as the merits of their claims against the Tribe, were issues for trial.

### D. Alter Ego

The appellants contend Stein is not liable for attorney fees assessed against SMDC, but the trial court's judgment in this case found Stein to be the alter ego of SMDC. Stein did not challenge the alter ego finding in his appeal from the judgment, which the Tribe expressly stated in the respondent's brief in connection with that appeal. After failing to raise his fact-dependent arguments about the trial court's alter ego finding on appeal from the judgment, Stein cannot attempt to raise his contentions in the appeal from the postjudgment order awarding attorney fees. (See *City of Los Angeles v. Metropolitan Water Dist. of Southern California, supra*, 42 Cal.App.5th at p. 310.) There was substantial evidence that SMDC operated as Stein's alter ego as well.

## Disentitlement Doctrine

The Tribe filed a motion with this appellate court seeking to dismiss the appeals brought by Stein and SMDC under the disentitlement doctrine based on Stein's actions in cases in other courts. We decline to exercise our discretion to dismiss the appeals.

"Under the disentitlement doctrine, a reviewing court has inherent power to dismiss an appeal when the appealing party has refused to comply with the orders of the trial court. [Citation.] ' "Appellate disentitlement 'is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction.' [Citation.]" [Citation.]' [Citation.] The rule applies even if there

is no formal adjudication of contempt.  [Citation.]  The disentitlement doctrine 'is particularly likely to be invoked where the appeal arises out of the very order (or orders) the party has disobeyed.'  [Citation.]  Moreover, the merits of the appeal are irrelevant to the application of the doctrine."  (*Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.* (2015) 238 Cal.App.4th 259, 265.)

" 'The power to dismiss an appeal for refusal to comply with a trial court order has been exercised in a variety of circumstances, including:  where a parent had taken and kept children out of the state in violation of a divorce decree [citations]; where a husband had failed to pay alimony as ordered in an interlocutory judgment of divorce [citation]; where a party in a civil action was a fugitive from justice and in contempt of the superior court for failure to appear on criminal charges after being released on bail [citation]; and where defendants willfully failed to comply with trial court orders regarding a receivership.  [Citation.]  Moreover, the inherent power to dismiss an appeal has been exercised in several cases where a party failed or refused to appear for a judgment debtor examination.' " (*Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.*, *supra*, 238 Cal.App.4th at pp. 265–266.)

Courts do not apply the disentitlement doctrine lightly, thus depriving an appellant of the right to appeal.  (*Findleton v. Coyote Valley Band of Pomo Indians* (2021) 69 Cal.App.5th 736, 756–757.)  We decline to apply the disentitlement doctrine in this case, having decided instead to consider the issues on the merits.  Therefore, the Tribe's motion to dismiss the appeals brought by Stein and SMDC based on the disentitlement doctrine is denied.

76

## DISPOSITION

The judgment is modified to reduce the amount of compensatory damages awarded from $20,411,067.23 to $19,161,067.23.  The judgment, as modified, and the postjudgment order awarding attorney fees are affirmed. Respondent Gabrielino-Tongva Tribe is awarded its costs on appeal.

NOT TO BE PUBLISHED.

MOOR, J.

We concur:

RUBIN, P. J.

KIM, J.

77